## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **KIMBERLY HERRON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.** |
| | ) | **6:18-CV-00604-KOB** |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

On June 19, 2015, Plaintiff Kimberly Herron applied for Supplemental Security Income under Title XVI of the Social Security Act. The claimant alleged a disability beginning on March 19, 2011 preventing her from employment. (R. 138). The Commissioner denied her claim on September 28, 2015. The Plaintiff then filed a timely request for and received a hearing before an Administrative Law Judge. (R. 81). The ALJ held the hearing on November 9, 2016. (R. 31).

In a decision dated June 1, 2017, the ALJ denied the claim, finding that the claimant was not disabled under the Social Security Act and thus not entitled to social security disability benefits. (R. 10, 25). On February 15, 2018, the Appeals Council denied a subsequent request for review. (R. 1-6). Consequently, the ALJ's decision became the final decision of the Commissioner. *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Based on the court's review of the record in this case and the parties' briefs, the court will affirm the Commissioner's decision.

1

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1.  Whether the ALJ had sufficient evidence to make an informed decision when the record did not contain an IQ test;

2.  Whether the ALJ erred by failing to expressly consider the claimant's "extremely low intellectual functioning" under Listing 12.05; and

3.  Whether substantial evidence supports the ALJ's conclusion that the claimant has a residual functional capacity to find work within the economy.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. The court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. The court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, the opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute its judgment of that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding if substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." To make this determination, the Commissioner employs a five-step, sequential evaluation process.

(1) Is the person presently unemployed?

       (2) Is the person's impairment severe?

       (3) Does the person's impairment meet or equal one of the specific
           impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

       (4) Is the person unable to perform his or her former occupation?

       (5) Is the person unable to perform any other work within the
           economy?

       An affirmative answer to any of the above questions leads either to
       the next question, or, on steps three and five, to a finding of
       disability. A negative answer to any question, other than step three,
       leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

To satisfy step three, the claimant's impairment must meet "all of the criteria" of

that listing under 20 C.F.R. Part 404, Subpart P, Appendix 1, "including any relevant criteria in

the introduction, and the duration requirement." 20 C.F.R. § 416.925(c)(3). To have a disability

under Listing 12.05, the claimant must show that she has (1) significantly subaverage general

intellectual functioning; (2) significant deficits in adaptive functioning; and (3) a history of

disorder that demonstrates the disorder began prior to the age of 22. 20 C.F.R. Pt. 404, Subpt. P,

App. 1, § 12.05.

Under the second element of Listing 12.05, to establish significant deficits in adaptive

functioning, the ALJ must find one extreme limitation or two marked limitations in the following

areas of mental functioning: (1) understanding, remembering, and applying information; (2)

interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or

managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The ALJ must find the same

significant deficits in adaptive functioning for the claimant to have a disability under Listings

12.02, 12.04, and 12.06. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02, 12.04, 12.06.

When considering a claimant's case, the ALJ has a basic obligation to develop a full and fair record, which ensures that the ALJ has fulfilled his duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. *Welch v. Bowen*, 854 F.2d 436, 440 (11th Cir. 1988). A full and fair record is one that enables a reviewing court "to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *See id.* A full and fair record must include the claimant's medical history for the 12 months prior to the date of the application for Supplemental Security Income. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

The claimant bears the burden to prove that she is disabled. *See Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). While the ALJ must consider all the relevant facts, she does not need to explicitly evaluate the claimant's impairment under every listing. *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986). However, when evaluating the evidence, the ALJ must state with particularity the weight she gave different medical opinions and the reasons for that weight; the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

## V. FACTS

The claimant was 41 years old at the time of the ALJ's final decision. (R. 34). The claimant has an eighth grade education and no past relevant work, though she briefly worked at a furniture plant, car wash, and fast food chain at separate times prior to 2010. (R. 36, 47, 160). The claimant's original application alleges disability based on back pain and mental problems. (R. 159).

*Physical Impairments*

Though the claimant appeals the ALJ's evaluations of only her mental impairments and not her physical impairments, the claimant did apply for disability based on her chronic back pain, so the court turns first to the claimant's physical impairments.

At some time in the 1990's, the claimant suffered a spinal injury from a car accident. She had surgery and has a rod in her back from that operation. (R. 192, 359-61).

In 2006, the claimant received treatment from Bryce Hospital in Tuscaloosa, Alabama for substance abuse and an incident where she became assaultive. The hospital gave her Naprosyn for her chronic back pain and recorded that she reported decreased pain levels. (R. 225-27).

In February 2010, the claimant demanded a whole body MRI from Capstone Rural Health. She told CRH that she had hepatitis C but did not claim to feel fatigued. Claimant also complained of back and neck pain but indicated no musculoskeletal pain, back spasms, swelling, or stiffness. CRH gave her a referral for X-rays at Walker Medical Diagnositics. (R. 314-317). At her 3-month follow-up, she did not discuss or mention her back pain with the physician. (R. 313).

In March 2012, Walker Baptist Medical Center admitted the claimant for her complaints about chest pain. Laboratory testing showed fairly normal results with only slightly low bilirubin. A later visit to Walker Baptist in September yielded more normal bilirubin results. (R. 341-43, 355). In September 2012, the claimant returned to CRH where she complained of back pain and received a pain management referral from CRH. (R. 310).

In October 2012, the claimant visited Walker Baptist for an MRI. The results showed the rods intact within her back, no fractures to any of her vertebrae, no evidence of a herniated disk,

no soft tissue abnormalities, and no chord abnormality or misalignment. The radiologist found some minimal disk bulges and grade 1 anterolisthesis. (R. 359-61).

The claimant returned to Walker Baptist in December 2012 and complained of stabbing pain in her back. She characterized the pain as mild and claimed it did not radiate. She also claimed to have a UTI, and the doctor prescribed pain relievers. (R. 388-95).

In March 2013, the claimant returned to CRH seeking another pain referral because of reported pain in her back and a feeling of "dirt and filth under her eyelids and a place on her nose that feels like something is crawling on her." (R. 308). CRH referred her to a pain management specialist. At a follow-up visit three months later, the claimant reported that she still had the "dirt sensation" and back pain, and requested a referral to a specific doctor in Tuscaloosa, Dr. Nordick. CRH prescribed her mupirocin. (R. 307-10).

On January 6, 2014, the claimant received care for a rash at Walker Baptist. The examining doctor observed no problems with the claimant's back and musculoskeletal system, and the doctor recorded that the claimant had a normal gait and range of motion. (R. 439-41). From June 21 to June 25, 2014, the claimant received treatment at Walker Baptist for a thumb lesion resulting from intravenous meth use. During this stay, the hospital recorded that she had a normal range of motion in her neck and musculoskeletal system. (R. 241-43).

In February 2015, Dr. Christopher Baalmann conducted a consultative physical exam of the claimant. He observed a full range of motion by the claimant; she could walk, squat, and touch her toes. Dr. Baalmann observed no abnormalities with her range of motion and found that the claimant had no limitations on her ability to stand, sit, walk, bend, reach, handle, lift, carry, see, or hear. (R. 483-84).

In April 2015, during a consultative mental evaluation, Dr. Susan Corbin observed that the claimant had normal posture and gait. (R. 486).

In September 2015, Dr. Boohaker examined the claimant, and observed no complications with the patient's liver. The claimant also denied any history of fatigue. The doctor recorded the claimant's reported back pain, but found that she had no limitations on her ability to sit, walk, bend, reach, handle, lift, carry, see, hear, or with memory and understanding; the claimant had a normal range of motion. (R. 498-502).

*Mental Impairments*

The court turns next to the claimant's mental impairments.

In 2006, while treating the claimant for substance abuse, Bryce Hospital gave the claimant a psychological assessment and recorded that the claimant had auditory hallucinations, impaired decision making, and a history of violent behavior. The hospital attributed much of these issues to drug use. Other testing indicated that the claimant had a full scale IQ of 65, verbal IQ of 66, and a performance IQ of 70, which is indicative of an extremely low range of intellectual functioning. The hospital also observed minor deficits in cognitive ability but found no severe anxiety or depression. (R. 223-29)

In May 2010, the claimant's examiner at CRH, Foster Jones, discussed with her the need to stop using drugs. (R. 313-14). From March to May 2011, the Northwest Alabama Mental Health Center committed the claimant as a patient to treat her substance abuse. The Center recorded the claimant's history with drug use. The claimant made little progress with her addiction, provided cold urine samples, and failed to comply with her treatment plan that included further substance abuse therapy. The Center terminated her from the program for her

noncompliance and after losing communication with her for 90 days. (R. 232-33).

At the March 2013 visit to CRH when the claimant reported "dirt and filth under her eyelids and a place on her nose that feels like something is crawling on her," the doctor observed that the claimant seemed alert and euthymic, but recorded the patient's claims of anxiety, irritability, depression, and sleep disturbances. At the follow-up meeting in May, the claimant still complained of the sand-in-the-eye sensation and was prescribed antibiotics. (R. 307-10).

On January 6, 2014, the claimant received care for a rash at Walker Baptist. Walker Baptist observed and recorded alert and oriented behavior, normal reflexes, normal mood and affect, and normal behavior and judgment. (R. 439-41). During her treatment of a thumb lesion resulting from intravenous meth use from June 21 to June 24, 2014, Walker Baptist recorded that the claimant was well-oriented but distressed, agitated, manipulative, and subject to mood swings. (R. 241-43).

In April 2015, Dr. Susan Corbin conducted a consultative mental evaluation of the claimant. During the interview portion of the evaluation, the claimant stated that she occasionally suffered from hallucinations, panic attacks, and often became irritable and angry. The day of the interview, Dr. Corbin observed good hygiene, a stable mental condition, good eye contact, normal speech, clear and logical thinking, and good orientation. The claimant could recall three named items from memory, spell "world," recall her name and social security number, name four U.S. Presidents, state how many months exist in a year, perform basic math, and follow spoken directions. The claimant could *not* subtract from twenty, perform well on digit span tasks, recall the names of five U.S. cities, state how many weeks exist in a year, or follow written directions. Dr. Corbin found that the claimant fell within the borderline range of intellectual functioning, but

did not conduct a formal intelligence test. She also found evidence showing that the claimant had mild to moderate impairment of short-term memory, mild to moderate impairment of ability to maintain concentration, and moderate impairment of long-term memory and remote memory functioning. Dr. Corbin stated that the claimant was evasive, irritable, and angry during the interview and observed that she made minimal effort. She also found that the claimant showed marked social impairment and moderate impairment in ability to adapt to change, but that she showed an ability to follow simple verbal instructions. (R. 486-90).

In August 2015, the claimant filled out a function report. She reported that she was able to take care of herself and that she watched TV with others. She also claimed that her impairments affected her sleep, she needed written reminders to go places like to get food stamps or see a doctor, she was not able to pay bills, and she had very poor attention skills. (R. 186-91).

During a second consultative evaluation in August 2015, Dr. Corbin recorded that the claimant had good hygiene, but reported a recent weight loss due to stomach issues. Dr. Corbin conducted several tests on the claimant. The claimant could remember three items, spell "world" correctly forwards and backwards, recite her name and social security number, and name common objects. The claimant could not subtract from twenty, perform well on the digit span tasks, remember three items after a three-minute delay, name four U.S. presidents or five U.S. cities, or perform multiplication or division in her head. She did not show strength at abstract thinking. Dr. Corbin found that the claimant fell in the extremely low range of intellectual functioning and that the claimant had moderate to marked impairment in short-term memory, moderate impairment in ability to sustain concentration, and moderate impairment in her long-term and remote memory functioning. The claimant gave Dr. Corbin conflicting answers when

discussing her history of drug use and jail time. Dr. Corbin observed that the claimant was irritable and evasive. Dr. Corbin concluded that the claimant would not be suited for a stable job mostly because of her borderline personality disorder. (R. 492-96).

Finally, in September 2015, Dr. Estock observed the claimant's record for an initial disability determination. After evaluating Dr. Corbin's and Dr. Boohaker's reports, Dr. Estock found that the claimant was physically capable of doing simple work and moderately mentally limited. He found Dr. Corbin's report only partially persuasive because of internal inconsistencies and inconsistency with the rest of the record. He also found jobs available in the state and national economy for someone with the claimant's abilities. (R. 64-71).

## The ALJ Hearing

After the Commissioner denied the claimant's request for SSI, the claimant requested and received a hearing before an ALJ on November 9, 2016. (R. 13, 31). At the hearing, the claimant testified that she lived with and assisted Everett Hendricks, a man roughly sixty-five years old. She stated that, for the past four years, she regularly helped him clean his house, retrieved the mail for him, and took him to the store. Mr. Hendricks does not compensate her for her service except for a place to live and the occasional fifty dollars. The claimant testified that she spends most of her free time watching TV and visiting with Mr. Hendricks. (R. 35-37). Later in the hearing, she testified that she only watches TV for two to three hours if at all, and most days she does not go near the TV. (R. 46). She claimed that she usually took a long time to do the work around the house. (R. 41).

The claimant also testified that she has only a seventh or eighth grade education and that she relies wholly on Mr. Hendricks, family, a local church, and others for necessities. She

claimed that she could not find employment mostly because of her back pain and mental health. The claimant testified that she was almost crippled by her back injury she suffered from the car accident when she was 14. She testified that she had surgery—a fusion of two vertebrae with rods and plates—following the accident. (R. 37-39, 44). The claimant stated that she used to receive SSI roughly 20 years prior, about which time she began to serve time in Tutwiler prison. The claimant testified that she does not regularly drink and that she has used marijuana once or twice in the past few years. (R. 39-41).

While being questioned by her attorney, the claimant stated that she had paranoid schizophrenia but no longer suffered from paranoia. She testified that she was extremely depressed, had problems with memorization and concentration, and had a bad long-term memory. The claimant said that she likes to be alone outside of spending time with Mr. Hendricks, her daughter, and her friend Becky. She testified that she had a difficult time following any schedule but that she is capable of handling money and finances. When asked further questions about her back, the claimant testified that she could stand in place for one hour, sit down for thirty minutes to several hours, and walk only short distances. She claimed that she had pain when lifting jugs of milk. On a scale from one to ten, the claimant stated that her daily pain was a nine most of the time and that she also had pain in her neck and shoulders. (R. 41-45).

Regarding her mental health, the claimant testified that she had difficulty watching TV for extended periods of time. She claimed that she was often "scared about her nerves" and manic on some days. When asked about her inability to maintain employment, the claimant asked, "what is employment?", and then testified that she would be unable to focus or concentrate in a work atmosphere. She claimed to not have health insurance. She also stated that

she has hepatitis C which makes her tired with low energy. (R. 41-47).

The vocational expert, Robert Mosley, testified to the type and availability of jobs that the claimant was able to perform. Mr. Mosley first observed that the claimant had no prior relevant work history. He then testified that someone of the claimant's age and education, who had no exertional limitations, who is capable of understanding, remembering, and carrying out simple work instructions but not those that were detailed and complex, who could adjust to workplace changes if they were infrequent and introduced gradually, who could have occasional interaction with the public and frequent interaction with coworkers, and who could sustain concentration for at least two-hour periods with normal breaks, could perform work as a motor vehicle assembler, hospital cleaner, or kitchen helper. The ALJ then asked Mr. Mosley to assume that the claimant could not interact with the public and only occasionally interact with her coworkers. Mr. Mosley said that the claimant could still perform the job of motor vehicle assembler and kitchen helper. He also recommended the job of package sealer. (R. 47-50).

Next, the ALJ asked Mr. Mosley to adjust the hypothetical and add light exertional limitations and remove the social restrictions. Mr. Mosley testified that, in that situation, the claimant could work as an offer marker, housekeeper, and a power screwdriver operator. Adding the social restrictions back in, Mr. Mosley testified that the claimant could work as an offer marker, power screwdriver operator, and a label marker. Mr. Mosley also testified that someone at these jobs could only be off task 10% of the time, and that being off task one third of the day would preclude all employment. Mr. Mosley stated that the claimant, if at one of these jobs, could not be absent more than once a month. (R. 50-52).

On June 1, 2017, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 25). First, the ALJ found that the claimant had not engaged in substantial gainful activity since June 19, 2015. (R. 15). Next, the ALJ found that the claimant had borderline intellectual functioning and a history of major depressive, borderline personality, generalized anxiety, bipolar, and substance abuse disorders. The ALJ found these impairments to be severe and significantly limit the claimant's ability to perform basic work activities.

While the ALJ observed that the evidence established a medical history of hepatitis C and spinal fracture with surgical repair, she found that these impairments were not severe enough to produce more than minimal work-related limitations. To support this conclusion, the ALJ observed that all the medical records testing the claimant's liver found normal liver functioning with healthy liver enzymes, bilirubin, and creatinine levels and normal glomerular filtration rates. The ALJ also observed that the claimant, while complaining of pain, frequently demonstrated no acute distress, normal motor functioning, no radicular pain, and normal reflexes at her medical visits. Particularly, at her visit with Dr. Baalmann, she demonstrated normal gait, was able to touch her toes and squat, and exhibited full motor strength and range of motion. Dr. Baalman concluded that she was not physically limited, and her primary care doctors found no musculoskeletal abnormalities. (R. 15-16).

The ALJ next found that the claimant did not have an impairment that, by itself or collectively, met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ evaluated the impairments under Listings 12.02, 12.04, and 12.06. (R. 17).

Under Listing 12.02, paragraph A, the ALJ evaluated the claimant's borderline intellectual functioning and cognitive abilities. Paragraph A requires evidence of significant decline in cognitive functioning. The ALJ attributed her borderline intellectual functions and cognitive limitations to her history of drug use, and observed that no evidence existed of the claimant's mental status prior to her drug use. The ALJ also found inconsistent evidence as to the claimant's memory impairment and low intellectual functioning (R. 17).

Under Listing 12.04, paragraph A, the ALJ evaluated the claimant's depression. The ALJ found that the claimant satisfied paragraph A with her depressed mood, diminished interest, sleep disturbance, low energy, and difficulty concentrating. (R. 17).

Under Listing 12.06, paragraph A, the ALJ evaluated the claimant's generalized anxiety disorder. She found that the claimant satisfied paragraph A with her demonstrated difficulty concentrating, irritability, and sleep disturbance. (R. 17).

Pursuant to the Listings' paragraph B, the ALJ evaluated the enumerated areas of mental functioning, observing that one extreme or two marked limitations in the areas of functioning would satisfy paragraph B. The ALJ ultimately concluded that the claimant did not satisfy paragraph B and found her moderately impaired in all areas of functioning. (R. 17-18)

In the "understanding, remembering, or applying information" area of functioning, the ALJ found that the claimant had only moderate limitations. She observed that the claimant could engage in normal mentation and cognition with no difficulty of understanding at the April 2016 and August 2016 psychological evaluations. The ALJ recognized that the claimant was good to fair at following instructions and that, despite the claimant's complaint of poor memory, her memory was moderately impaired to normal in functioning. (R. 17).

In the "interacting with others" mental area under paragraph B, the ALJ found that the claimant had moderate limitations because of her ability to shop in public, her cooperation during all but two of her psychological evaluations, and her ability to get along with friends, family, and her roommate. The ALJ recognized that Dr. Corbin found the claimant markedly impaired, but attributed that to the claimant's "lack of effort." (R. 17-18).

In the "concentrating, persisting, or maintaining pace" category, the ALJ found that the claimant had moderate limitations because the claimant demonstrated only mild to moderate limits in concentration during her psychological evaluations and claimed to concentrate on TV for extended periods of time. (R. 18).

Finally, the ALJ found that the claimant had only moderate limitations in her ability to "adapt and manage oneself." The ALJ observed the claimant's ability to prepare meals, clean, and do laundry, as well as her demonstration of normal mood and logical thought. The ALJ also noted the claimant's history of polysubstance abuse. (R. 18).

Under the Listings' paragraph C, the ALJ found that the evidence failed to establish that the claimant has "marginal adjustment"; *i.e.*, the minimal capacity to adapt to changes in her environment or to demands that are not already a part of her daily life. The ALJ cited the claimant's general ability to care for herself, engage in normal daily activities, and the lack of hospitalization for psychological symptoms. (R. 18).

Next, the ALJ evaluated the claimant's residual functional capacity. The ALJ found that the claimant has an RFC to perform work at all exertional levels with certain non-exertional limitations, namely simple instructions, infrequent changes to work, only occasional interaction with coworkers, and breaks throughout the day.

The ALJ evaluated the impairments' combined effects on the claimant and considered whether the symptoms could be reasonably accepted as consistent with objective medical evidence. After restating the facts, the ALJ determined first that, though no underlying determinable impairment existed, the alleged symptoms were not consistent with the medical evidence. Notably, the treatment records and consultative examinations illustrated no mental health symptoms to which the claimant testified. The ALJ observed that, throughout the medical records, the claimant demonstrated normal cognition, she exhibited no evidence of difficulty with memory or understanding with Dr. Baalmann, and she cooperated during her physical examinations. The ALJ did not find the claimant's testimony convincing because of her inconsistent statements in asserting and denying drug use, asserting and denying hospitalizations, and asserting and denying prison time. (R. 22-23).

The ALJ assigned great weight to the opinions of Dr. Baalmann and Dr. Boohaker because she found their conclusions consistent with the medical evidence. The ALJ also gave great weight to state agency consultant Dr. Robert Estock, who only reviewed records, but found that the medical evidence showed that the claimant had greater social limitations than those offered by Dr. Estock. The ALJ gave Dr. Corbin's opinions only some weight, largely because some of her statements were inconsistent with themselves and the record.

Finally, the ALJ observed that the claimant had no past relevant work, was a younger individual, has a limited education and speaks English, and that job transferability was not an issue. After considering the claimant's RFC and the Medical-Vocational guidelines, the ALJ found that jobs existed in significant numbers in the national economy at the claimant's RFC, namely motor vehicle assembler, kitchen helper, and package sealer. (R 24-25). So, the ALJ

concluded that the claimant did not have a disability under the Social Security Act. (R. 25).

## VI. DISCUSSION

The claimant argues that (1) the ALJ did not develop a full and fair record with sufficient evidence to make an informed determination under Listing 12.05 by not obtaining an IQ test; (2) the ALJ erred by not considering the claimant's impairments under Listing 12.05; and (3) substantial evidence does not support the ALJ's conclusion regarding the claimant's residual functional capacity. The court addresses each of the claimant's contentions in turn.

### Issue 1: The ALJ's Development of a Full and Fair Record

The claimant asserts that the ALJ did not develop a full and fair record to make a determination under Listing 12.05 because the record lacked a formal IQ test. The claimant further asserts that, because of the allegedly deficient record, the ALJ did not have enough evidence to properly discount her "borderline intellectual functioning" as not falling within Listing 12.05.

While the ALJ has a duty to create a full and fair record that is capable of informing him as to the disabled status of the claimant, her record is not inadequate unless the claimant shows prejudice caused by evidentiary gaps. *Graham*, 129 F.3d at 1422-23. As long as the record contains sufficient evidence for the ALJ to make an informed decision, she has no duty to order further examinations. *Ingram v. Comm'r of SSA*, 496 F.3d 1253, 1269 (11th Cir. 2007).

Here, the record does contain a 2006 psychological assessment showing a full scale IQ of 65, verbal IQ of 66, and a performance IQ of 70. (R. 227). The claimant thus incorrectly asserted that the record lacked this information.

Secondly, the claimant has a duty to prove her disability. *See Doughty*, 245 F.3d at 1278.

Neither the claimant nor her counsel brought up her IQ at the hearing, the claimant did not attempt to offer evidence, and the record contains no evidence of a request for further testing by the claimant.

Finally, even without the 2006 IQ test, the record would not contain evidentiary gaps, much less any prejudice against the claimant. The claimant's medical record has multiple references to her history with drug abuse. (R. 228, 232, 314). As discussed by the ALJ, the claimant's history of drug abuse and lack of effort fairly explains her poor scoring on Dr. Colvin's mental examinations. (R. 23-24). The record also does not contain any formal diagnosis of an intellectual disorder, so substantial evidence supports the decision that her "borderline intellectual functioning" is not the result of a Listing 12.05 intellectual disorder, but rather a Listing 12.02, 12.04, or 12.06 mental disorder; an IQ test is not necessary for evaluation under those Listings. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02, 12.04, 12.06.

Thus, the ALJ did not fail to compile a full and fair record because the record contained an IQ test and the complete medical record does not suggest that the ALJ should have evaluated the claimant's impairments under Listing 12.05.

*Issue 2: Evaluation under Listing 12.05*

The claimant next argues that the ALJ erred by failing to consider whether the claimant's "borderline intellectual functioning" meets or equals an impairment under Listing 12.05. The claimant further contends that she is presumptively intellectually disabled under 12.05(B) with a potential IQ score of below 60. *See Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The claimant also argues that she is intellectually disabled under Listing 12.05(C) and that the ALJ failed to discuss her possible disability under that Listing.

19

On January 17, 2017, the Social Security Administration revised Listing 12.05. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,167 (Sept. 26, 2016) (codified at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05). In doing so, the SSA eliminated the previous section 12.05(C) and the presumptive intellectual disability discussed in the claimant's brief and in *Crayton*. The ALJ correctly did not apply an outdated and inapplicable standard.

In any event, the court will review the claimant's contention that the ALJ erred by not finding her impaired under Listing 12.05. During step three of the evaluation process, the ALJ must determine whether the claimant's impairments meet or equal any listing under 20 C.F.R. Pt. 404, Subpt. P, App. 1. But, the ALJ does not need to explicitly evaluate the impairments under every listing. *Hutchison*, 787 F.2d at 1463. By not discussing a listing, the ALJ implies that the claimant does not meet the criteria of that listing, especially if substantial evidence supports this conclusion. *Id.* The question, then, is whether substantial evidence exists for the ALJ to find that the claimant's impairments do not qualify under Listing 12.05.

Listing 12.05(A) only applies to those who lack the cognitive capabilities to participate in standardized IQ testing. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(A)(1). Because the record shows that the claimant previously took an IQ test, Listing 12.05(A) does not apply, and the court will turn to Listing 12.05(B). (R. 227).

Under Listing 12.05(B), the claimant must demonstrate all of the following elements: (1) significantly subaverage intellectual functioning; (2) significant deficits in adaptive functioning; and (3) evidence about the claimant's intellectual functioning and disorder that supports the conclusion that the disorder began prior to the age of 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1

§ 12.05(B). The IQ score relates only to determining "significantly subaverage intellectual functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(B)(1).

To establish "significant deficits in adaptive functioning" under Listing 12.05(B)(2), the claimant must have either one extreme limitation *or* two marked limitations in the four enumerated areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(B)(2). Listings 12.02, 12.04, and 12.06 require the same criteria. Because the ALJ discussed those Listings at length, the ALJ functionally evaluated the claimant's abilities under 12.05(B) and determined that she had only moderate limitations in all four areas.

And substantial evidence supports that conclusion. Dr. Corbin saw the claimant twice, and each time found a *moderate* impairment in her memorization ability, her concentration ability, and her ability to adapt and manage herself. (R. 489-90, 496). Dr. Corbin found the claimant to be markedly impaired in social interaction, but also stated that the claimant was angry, irritable, and confused as to why the psychological evaluation was necessary. (R. 496).

In giving the claimant a moderately impaired evaluation rather than marked, the ALJ cited the claimant's ability to get along with friends and family and to go shopping in public with others. (R. 18). The record shows that most of her social outbreaks occurred following the use of illegal substances, and that she was able to confidently communicate with medical personnel when necessary. (R. 225-28, 238, 305-14). And, even if the ALJ fully adopted Dr. Corbin's opinions, one marked limitation is not enough to establish "significant deficits in adaptive functioning" under Listing 12.05(B).

Finally, only limited evidence suggests that the claimant had an intellectual disorder that manifested before the age of twenty-two. In her application, the claimant stated that she was not disabled prior to age twenty-two. (R. 138). This fact aside, the ALJ had sufficient evidence to conclude that the claimant's mental condition derived more from her substance abuse. As discussed above, the claimant's medical record has multiple references to her history with substance abuse. (R. 228, 232, 314, 493). No formal diagnosis of an intellectual disorder exists on the record. While her poor performance in middle school could be evidence of an intellectual disorder, that evidence alone does not change the fact that the ALJ had substantial evidence to conclude otherwise.

So, because substantial evidence supports that the claimant does not have an intellectual disorder, the ALJ did not err by neglecting to consider the claimant's impairment under Listing 12.05.

*Issue 3: The ALJ's Assessment of the Claimant's RFC*

Finally, the claimant argues that substantial evidence does not support the ALJ's conclusion that she had the RFC to find employment with the non-exertional limitations of simple instructions, infrequent changes to work, only occasional interaction with coworkers, and breaks throughout the day. Specifically, the claimant argues that substantial evidence does not support the ALJ's conclusion because her poor concentration skills and memory inhibit her from finding work. For the following reasons, the court disagrees.

The claimant correctly points out that an ALJ decision that focuses on one aspect of the evidence, while disregarding or failing explicitly to discredit other contrary evidence, is not based on substantial evidence. *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). But

the claimant incorrectly asserts that the ALJ committed this error.

Rather, the ALJ discussed the evidence that weighed against her RFC determination, including Dr. Corbin's testimony, and concluded that the claimant had the requisite RFC to work. Dr. Corbin testified to the claimant's only moderate limitations in her concentration and memory. (R. 490, 496). While Dr. Corbin ultimately found that the claimant was not a suitable candidate for a job, she based her findings on the claimant's history of drug abuse, history of prison time, and personality problems—not her lack of concentration ability. Citing the claimant's functional mental status shown throughout all of her other medical records, the ALJ discussed at length why she disagreed with Dr. Corbin's assessment of the claimant's social skills and opinion that they completely inhibited her from obtaining a job. (R. 22). The ALJ also stated that she discredited the claimant's statements regarding her own concentration and social skills because her statements were frequently inconsistent. (R. 35-37, 46).

So, substantial evidence supports the ALJ's finding that the claimant did not suffer from concentration problems that were severe enough to preclude employment.

## VII. CONCLUSION

For the reasons stated above, substantial evidence supports the Commissioner's decision. Accordingly, by separate order, the court will **AFFIRM** the Commissioner's decision.

**DONE** and **ORDERED** this 23rd day of September, 2019.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE

23